UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAR 2·9 2019

BARBARA NIXON and JOYCE SMITH,

Plaintiffs,

–v–

TWC ADMINISTRATION LLC,

Defendant.

16-cv-6456 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Plaintiffs Barbara Nixon and Joyce Smith bring this action against their former employer TWC Administration LLC alleging that Defendant's termination of their employment as Inbound Sales Representatives constituted unlawful age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") and age and disability discrimination in violation of the New York City Human Rights Law ("NYCHRL"). Before the Court are Defendant's motions for summary judgment as to each Plaintiff and Plaintiffs' motion to strike declarations submitted in support of those motions. For the following reasons, Plaintiffs' motion to strike is DENIED and Defendant's motion for summary judgment is GRANTED as to Plaintiff Nixon's federal claims. The Court DECLINES to exercise supplemental jurisdiction over Plaintiff Nixon's remaining NYCHRL claims and Plaintiff Smith's claims, all of which are asserted under the NYCHRL.

I. **Procedural Background**

On August 15, 2016, Plaintiffs filed their complaint against Defendants TWC Administration LLC and Time Warner Cable, Inc. Dkt. No. 1. Both Defendants moved to dismiss that complaint, and on September 27, 2017, the Court denied Defendants' motion. Dkt.

Nos. 13, 34. On October 27, 2017, Defendant Time Warner Cable was voluntarily dismissed from this action. Dkt. No. 41. On August 15, 2018, Defendant TWC moved for summary judgment as to each Plaintiff. Dkt. Nos. 61, 67. Plaintiffs then moved to strike declarations filed with each summary judgment motion on the basis that the declarants were not disclosed in violation of various disclosure requirements under Federal Rule of Civil Procedure 26(a) and (e). Dkt. No. 77. All three motions were fully briefed as of October 11, 2018. *See* Dkt. Nos. 92–97.

## II.    Plaintiffs' Motion to Strike Is Denied

Plaintiffs' motion to strike is premised on Defendant's purported failure to fulfill its discovery disclosure obligations. Specifically, Plaintiff contends that Defendant was obligated to disclose its summary judgment declarants Shannon Boutte and Daymion Montanez as witnesses in response to Plaintiffs' first interrogatory, under Rule 26(a)(1)(A)(i), or pursuant to Defendant's Rule 26(e) obligations to supplement its Rule 26(a)(1) disclosures. *See* Dkt. No. 79 at 2–4; Dkt. No. 97 at 1–4. Defendant explained in its response papers that it offered the new declarants in light of its previously disclosed corporate representative's departure from the company. Dkt. No. 89 at 5–6. Even if Plaintiffs are correct that Defendant violated one or all disclosure obligations, the Court concludes that striking these declarations is nonetheless inappropriate.

Rule 37 provides that a party that fails to "provide information or identify a witness as required by Rule 26(a) or (c) . . . is not allowed to use that information or witness to supply evidence on a motion . . . or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Courts consider the following factors when deciding whether to preclude the use of undisclosed evidence under this rule: "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the

precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) (internal brackets omitted) (quoting *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)).

These factors do not favor exclusion. As to the first factor, Defendant maintains that it did not disclose Montanez and Boutte because it had no obligation to identify corporate representatives by name and was unaware until briefing summary judgment that its previously disclosed corporate representative no longer worked for the company. Dkt. No. 89 at 5–6 & n.2. Although Plaintiff is correct that counsel's lack of diligence does not excuse failure to comply with discovery disclosure obligations, lack of diligence weighs less heavily in Defendant's disfavor than bad faith, of which there is no evidence. The second factor favors Defendant, as the contested declarations authenticate documents central to this case and provide evidence of the purported technological impossibility of a central element of Plaintiff's discrimination case. Plaintiff's response that the importance of the testimony weighs *for* exclusion misstates the law, as the Second Circuit in *Patterson* and *Design Strategy* was concerned with the importance of the contested evidence to the party that offered it, not to the party that sought exclusion. *See Patterson*, 440 F.3d at 117–18; *Design Strategy*, 469 F.3d at 296–97.

The third factor also disfavors exclusion because Defendant's delayed disclosure presents no harm to Plaintiffs for purposes of this summary judgment motion. The declarations primarily serve to authenticate documents no party contests were properly produced in discovery and otherwise cover similar subject matter as the Rule 30(b)(6) deposition. To the extent the declarations identify disputed facts regarding Defendant's antidiscrimination policies or the operation of its phone queues, the Court's application of the summary judgment standard below

3

requires no consideration of those facts. Finally, as to the fourth factor, there is no impossibility of a continuance; to the contrary, to the extent that any sanction for Defendant's failure to disclose were appropriate, that sanction would be reopening discovery for the limited purpose of permitting Plaintiffs to take the depositions of the newly disclosed corporate representatives at Defendant's cost. If Plaintiffs' claims could survive summary judgment, they would be entitled to ask the Court to impose that sanction.

In short, the Court concludes that Defendant's failure to disclose its updated corporate representatives as witnesses was harmless to Plaintiffs for purposes of these summary judgment motions, and accordingly declines to strike either declaration.

## III. Factual Background

Except as otherwise noted, the following facts are not in dispute and are taken from Defendant's Reply 56.1 Statements, Dkt. No. 93 ("Nixon Reply 56.1") and Dkt. No. 94 ("Smith Reply 56.1").[1] Facts asserted by Defendant and not denied by Plaintiffs are deemed admitted for purposes of these motions. S.D.N.Y. Local Rule 56.1(c).

Defendant TWC employed Plaintiffs as Inbound Sales Representatives at a call center in College Point, New York. Nixon Reply 56.1 ¶ 5; Smith Reply 56.1 ¶ 4. Plaintiffs served as Inbound Sales Representatives at this call center prior to their respective terminations on December 7, 2012 and February 16, 2013. Nixon Reply 56.1 ¶ 20; Smith Reply 56.1 ¶ 19. The precise length of Plaintiffs' employment with TWC is not an undisputed fact, but the parties agree that Nixon served in the Inbound Sales Representative position for approximately six years prior to her termination. Nixon Reply 56.1 ¶ 20. Nixon testified that she worked for TWC for

---

[1] Notwithstanding the Court's conclusion that it will not exercise supplemental jurisdiction over Plaintiff Smith's claims, the parties' claims are closely related and Plaintiffs brief their opposition jointly. The Court accordingly considers here all facts identified as to Plaintiff Smith's claim to the extent they are also pertinent to Plaintiff Nixon's claim.

approximately 16 years in total. Nixon Dep., Dkt. No. 80-1 at 37:9–25. Smith testified that she began her employment with TWC in 1994, served as a supervisor in the Inbound Sales department from 1999 to 2007, and requested a demotion to the position of Inbound Sales Representative in 2007, which position she held until her termination. Smith Dep., Dkt. No. 80-2 at 30:19–21; 36:21–23; 33:20–34:3; Smith Decl., Dkt. No. 80-7 ¶¶ 3, 5. It is uncontested that Plaintiffs were over 40 at all times pertinent to this lawsuit.

1.      **The Inbound Sales Representative Position**

Among Inbound Sales Representatives' responsibilities were answering calls from prospective and existing customers who called TWC's 1-800 number or other customer service help line. Nixon Reply 56.1 ¶ 6; Smith Reply 56.1 ¶ 6. A customer who called either line reached an automated directory that walked her through prompts to identify the matter with which she needed assistance. Nixon Reply 56.1 ¶ 7; Smith Reply 56.1 ¶ 6.

The parties dispute whether each customer was automatically routed to a representative in a particular department as a result of these selections. *See* Nixon Reply 56.1 ¶ 7; Smith Reply 56.1 ¶ 7. Plaintiffs contend that while *customers* were routed into the appropriate queue after they pressed the corresponding number on their dialpad, *representatives* could be reassigned from their ordinary inbound sales queue to a separate queue for customer service when a long queue formed for the latter. Nixon Reply 56.1 ¶¶ 7–11; Smith Reply 56.1 ¶¶ 6–10. Defendants contend that it was technologically impossible for Inbound Sales Representatives to be assigned to or otherwise answer calls from the sales queue. *See* Nixon Reply 56.1 ¶¶ 7–11; Smith Reply 56.1 ¶¶ 6–10.

2.    **Alleged Instances of Discrimination**

Plaintiffs alleged wrongful termination and hostile work environment based on Nixon's age in violation of the ADEA and the NYCHRL and failure to accommodate Nixon's disability in violation of the NYCHRL.

### a.    Termination of Plaintiff Nixon

Plaintiff Nixon alleged that she was terminated from her employment with TWC based on her age. The parties agree that Nixon violated TWC policies, but disagree whether she was terminated based on those policy violations or as pretext for Defendant's impermissible age-based motivations.

#### i. .    Relevant Policies

Two sets of TWC policies are relevant to this motion: TWC's login policies and TWC's performance metrics.[2] As to the former, TWC's Inbound Sales Representatives were assigned unique sales IDs (or "extensions") in order to log into a computer phone program that would connect them to callers. Nixon Reply 56.1 ¶¶ 12–13. TWC had policies that prohibited Inbound Sale Representatives from using a sales ID that was not their own. Nixon Reply 56.1 ¶ 15. The parties disagree about how "strict" this prohibition was. Nixon Reply 56.1 ¶ 15. Plaintiffs point out that the portion of TWC's policy manuals listing the prohibition does not discuss the possibility of termination. Nixon Reply 56.1 ¶ 15. Defendant responds that the same portion of the manual states that agents not adhering to this sales standard would be placed on what the company calls "corrective action," and that TWC's Corrective Action Policy explicitly noted

---

[2] In order to ensure that it omits no evidence pertinent to Plaintiff Nixon's federal claims, the Court includes herein a summary of relevant evidence introduced in the Rule 56.1 Statements filed in relation to Defendant's motion for summary judgment as to Plaintiff Smith's claims.

that, "depending on the severity of the violation," corrective action could result in termination. Nixon Reply 56.1 ¶ 15.

TWC policies also prohibited IBS Representatives from engaging in "call avoidance"— defined as any action taken to avoid answering a customer call—and identified call avoidance as a "zero-tolerance" behavior that may result in termination of employment. Nixon Reply 56.1 ¶¶ 16–17. The parties disagree whether logging into another employee's extension constitutes call avoidance. *See* Nixon Reply 56.1 ¶ 16.

Turning to performance metrics, TWC measured Inbound Sales Representatives' performance as a percentage of the average performance of the other Inbound Sales Representatives who worked the same shift, looking initially to the average sales made by other Inbound Sales Representatives on their shift, and as of June 2012 to the average sales made by other Inbound Sales Representatives on their shift for both a combination of products and average monthly revenue per call handled. Smith Reply 56.1 ¶¶ 15, 22, 27–28. These standards applied to each Inbound Sales Representative, although Plaintiffs contend that the standards were biased against older representatives who were assigned to the less lucrative service queue. Smith Reply 56.1 ¶¶ 15–16.

Over the course of 2012, TWC performance standards required Inbound Sales Representatives to meet an 85 percent threshold for the applicable metric; in August, it raised the required threshold to 90 percent. Smith Reply 56.1 ¶¶ 22, 27–28, 30.

### ii. Nixon's Violations of TWC Policies

TWC disciplinary records state that on three separate occasions in the fall of 2012, Plaintiff Nixon, who was assigned Ext. 1463073, signed into another agent's extension in lieu of her own: Ext. 1473073 on October 13, 2012 from 7:03 a.m. to 12:20 p.m.; Ext. 1473065 from

7:01 a.m. to 9:04 a.m. on October 22, 2012; and again Ext. 1473073 from 7:03 a.m. to 11 a.m. on November 8, 2012. Nixon Reply 56.1 ¶¶ 23–26, 30; *see also* Dkt. No. 72–11 at 1–2. On each occasion these records report that Plaintiff spent one and a half to two hours without receiving a call but did not report the incidents. *See* Nixon Reply 56.1 ¶¶ 23–26, 29; Dkt. No. 72–11 at 1–2. TWC nonetheless learned about them and conducted an investigation. *See* Nixon Reply 56.1 ¶¶ 30, 32. Notes from the resulting interview with Plaintiff state that Plaintiff informed the investigators she was unaware that she had signed into the wrong extension and that she admitted that it was unusual not to receive calls, but failed to report the incidents because she had lost track of time. Nixon Reply 56.1 ¶¶ 30–31. The same records report the finding that Plaintiff had violated the call avoidance policy and that termination was recommended. *See* Nixon Reply ¶ 33. Nixon admits that these incidents occurred insofar as she admits that she was unaware she had logged into the wrong ID on each occasion and attributes her failure to report to this lack of knowledge. Nixon Reply 56.1 ¶¶ 30–31.

TWC records also indicate that Nixon had been subject to additional disciplinary actions in the fall of 2012, including written warnings for failure to follow sales protocols, for attendance, for misconduct and insubordination for reportedly refusing a coaching session and telling her supervisor to go away, and a written warning and improvement plan for failure to satisfy TWC performance standards. Nixon Reply ¶ 34. Several of these warnings were "final." Nixon Reply ¶¶ 34, 50.

### iii.    Nixon's Termination

TWC terminated Plaintiff's employment effective December 7, 2012. Nixon Reply 56.1 ¶ 35. It maintains this decision was made by management, with human resources review, after reviewing Nixon's policy violations and disciplinary history. Nixon Reply 56.1 ¶ 35. Nixon

8

disputes this explanation, contending that TWC acted with discriminatory motives in making its termination decision based upon a theory that TWC's workplace was permeated with age discrimination: Smith testified that TWC implemented an age-based queue routing practice that systematically disadvantaged older employees, Plaintiffs testified that their experience reflected this practice, and Plaintiffs testified that supervisors made discriminatory comments and harassed employees based on age. Nixon Reply 56.1 ¶¶ 9, 35, 65; Smith Reply 56.1 ¶¶ 7, 48. Defendant contends that this discriminatory queue-routing theory was technologically impossible and that supervisor animus did not drive the termination decision. *See* Nixon Reply 56.1 ¶¶ 9–10, 35, 59; Smith Reply 56.1 ¶¶ 9–10. Nixon concedes that the supervisors who allegedly made discriminatory comments did not unilaterally make the decision to terminate her employment and that she does not recall the date of these alleged discriminatory comments. Nixon Reply 56.1 ¶¶ 59–60.

### b. Hostile Work Environment

Plaintiffs also alleged hostile work environment claims based largely on the same courses of conduct described above. The parties' submissions do not identify further facts pertinent to Nixon's hostile work environment claim.

### 3. Plaintiffs File Suit

In response to their terminations, Plaintiffs filed this employment discrimination action, asserting claims for age and disability discrimination under the ADEA and NYCHRL.

## IV. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating "that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., LP*, 22 F.3d 1219, 1223 (2d Cir. 1994). When the burden of proof at trial would fall on the nonmoving party the moving party may meet its burden by "point[ing] to a lack of evidence . . . on an essential element of the non-moving party's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). In order to avoid summary judgment, "the nonmoving party must then come forward with admissible evidence sufficient to raise a genuine issue of material fact for trial." *Id.*; *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (2d Cir. 1986).

In making this determination, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (Sotomayor, J.) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)). But the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts" and "may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quotations omitted).

Although it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2011), the Second Circuit has "repeatedly emphasized the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d

Cir. 2010) (quotation omitted). Indeed, "direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions," *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001)); *see also Gallo*, 22 F.3d at 1224. But "mere speculation and conjecture" as to whether an employer's motives were discriminatory remains "insufficient to preclude" summary judgment. *Harlen Assoc. v. The Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

## V. Discussion

Defendants move for summary judgment against both Plaintiffs and as to all claims.

### A. Plaintiffs' ADEA Hostile Work Environment Claims Are Abandoned

As an initial matter, Nixon asserted hostile work environment claims against Defendant under the Age Discrimination in Employment Act ("ADEA"). In their opposition, however, Plaintiffs fail to respond to any of Defendant's arguments that such claims should be dismissed. The sum total of their briefing consists of one block quote, one incomplete citation, and no analysis.

"[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014). That determination is appropriate here. Although Plaintiffs do not ignore the claims entirely and label a section of their brief opposing Defendant's argument, they respond to none of Defendant's arguments that the conduct in the record falls short of the hostile work environment standard. This response fails to preserve any hostile work environment claims. "When a party opposing summary judgment fails to respond to the moving party's argument on a claim, the Court may deem the claim abandoned." *Grassel*

*v. Dep't of Educ. of City of N.Y.*, No 12-CV-1016 (PKC), 2015 WL 5657343, at *9 (E.D.N.Y. Sept. 24, 2015); *see also Burchette v. Abercrombie & Fitch Stores, Inc.*, No. 08-CV-8786 (RMB), 2009 WL 10699568, at *2 (S.D.N.Y. Sept. 16, 2009) ("The Court is not required to scour a party's various submissions to piece together appropriate arguments.") (quotation and alterations omitted).

Even in the absence of abandonment, what is provided by the Plaintiffs is unpersuasive, and Defendant's arguments and evidence would prevail under the summary judgment standard as to Plaintiffs' ADEA claims. *See Kassner v. 2nd Ave. Deli, Inc.*, 496 F.3d 229, 240 (2d Cir. 2007) (finding supervisor statements to "drop dead," "retire early," "take off all of that make-up," and "take off your wig" insufficient to make the required showing that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment").

Accordingly, Defendant's motion for summary judgment as to Nixon's hostile work environment claims under the ADEA is granted.

### B.   Defendant's Motion for Summary Judgment as to Nixon's ADEA Termination Claim Is Granted

Nixon claims that she was terminated in violation of the ADEA, which "prohibits employers from discriminating against workers aged 40 or older on the basis of their age." *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994).

Courts in this circuit analyze ADEA wrongful termination claims under the familiar *McDonnell Douglas* burden-shifting framework. *See Gorzynski*, 596 F.3d at 106. Under this framework, the plaintiff must establish a prima facie case of intentional discrimination. *Id.* at 105. If she does so, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for the claimed adverse employment action. *Id.* If it articulates such a

reason, the plaintiff may still prevail if she can proffer enough evidence from which a reasonable jury could conclude that her age was a but-for cause of the adverse employment action. *Id.* at 105–07.

Regardless of whether Nixon could establish a prima facie case under the ADEA, she fails to identify a triable issue on the last question: whether her age was a but-for cause of her termination.

1. **The Court Assumes Nixon Establishes a Prima Face Case Under the ADEA**

In order to establish a prima facie case of age discrimination under the ADEA, Nixon must show "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Id.* at 107. This burden is not a heavy one, *Gorzynski*, 596 F.3d at 107, and the Court assumes *arguendo* it is met in this case notwithstanding Defendant's arguments that Plaintiff's disciplinary history rendered her unqualified for her position and that Plaintiff cannot establish an inference of discrimination based on the summary judgment record.

2. **Defendant TWC Produced Evidence of a Nondiscriminatory Reason for Nixon's Termination**

To satisfy the second prong in the *McDonnell Douglas* framework, TWC must produce evidence that Nixon was terminated for a legitimate nondiscriminatory reason. *See Holcomb v. Iona College*, 521 F.3d 130, 140 (2d Cir. 2008). In evaluating whether TWC has met this burden, the Court asks "whether defendant has introduced evidence that, "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason" for its action. *Id.* at 141 (quotation omitted). Here, TWC's burden is satisfied by the undisputed evidence that Nixon

violated TWC's policies by logging in with another representative's sales ID on three separate occasions against a backdrop of disciplinary violations.

### 3. No Reasonable Jury Could Conclude that Age Was a But-For Cause of Nixon's Termination Based on the Summary Judgment Record

The Court turns next to whether, notwithstanding Defendant's proffered nondiscriminatory justification for Plaintiff's termination, Plaintiff has identified sufficient evidence from which a reasonable jury could conclude that her age was the but-for cause of her termination.

Nixon concedes that the undisputed facts indicate that she violated several of Defendant's policies but maintains that her termination on the basis of such violations was pretextual. Nixon's argument is not, as Defendant contends, that it could not have been a reasonable exercise of Defendant's business judgment to terminate an employee with Nixon's record for repeatedly logging in to another agent's extension. The argument is that Defendant did not actually terminate Plaintiff on this basis, but used her purported policy violations as pretext to justify pushing her out of the company because she was deemed too old. To advance this argument, Nixon claims that there are genuine disputes of material fact as to whether (1) it was a standard policy to terminate employees who engaged in the conduct she did; (2) TWC supervisors made ageist remarks; and (3) TWC implemented ageist policies by actively manipulating the feed of calls to older representatives in order to downgrade their performance evaluations and justify firing them. Together, Nixon maintains that the evidence of these facts provides a basis from which a jury could reasonably find by a preponderance of the evidence that age was a but-for cause of her termination. The Court disagrees.

### a.     TWC's Policies Indisputably Permitted Terminating Plaintiff

As an initial matter, Nixon contends that the record shows that termination was not a standard consequence for her misconduct.  Her theory is that logins to other employees' extensions were ordinarily treated as mistakes to be corrected by a supervisor, but treated punitively in Nixon's case because of her age.  Nixon fails to raise a genuine dispute of material fact as whether to her termination was consistent with Defendant's policies.

Nixon's evidence of a more permissive policy is as follows.  First, Defendant's policy manuals do not specifically list logging into another employee's extension as an example of zero-tolerance call avoidance behavior and do not specifically list termination as a consequence for logging into another employee's extension.  *See, e.g.*, Dkt. No. 80-4 at 7, 12–13; Dkt. No. 80-5 at 7, 12–13.  Second, Smith offered declaration testimony that when she was a supervisor it was her "responsibility as a supervisor to monitor" and alert sales representatives of mistaken logins and that she "understood" supervisors continued to have this responsibility.  Smith Decl. ¶¶ 7–11.  Third, Nixon testified that a younger Inbound Sales Representative informed her that he had logged in to the wrong ID without facing discipline.  Nixon Dep. at 142:14–16; Dkt. No. 80-9 at 6.

These facts, together with the undisputed facts of Defendant's call avoidance and sales standards policies, are not sufficient for a reasonable jury to conclude that Defendant deviated from its ordinary policies in terminating Nixon.  Although the facts contest whether termination would be a *necessary* consequence for Nixon's conduct, they fail to show it would be nonstandard, particularly when Nixon violated the policy numerous times in a short period— unlike her putative comparator.  *See* Nixon Dep. at 142:17–23.  Nixon's references to the text of the policy manuals do not support her characterization of Defendant's policies: the manuals

straightforwardly provide for progressive discipline depending on the severity of the violation, up to and including termination. *See, e.g.*, Dkt. No. 80-4 at 10; Dkt. No. 80-5 at 10. And Plaintiff Smith's general testimony that it was her "responsibility as a supervisor" to monitor log-ins or that she "understood" other supervisors to continue to have such responsibility is not evidence that Defendant had any kind of policy disfavoring termination as a possible consequence for conduct like Nixon's. The remainder of Plaintiffs' assertions do not move this inference over the line from speculative to reasonable.

### b.    Supervisors' Discriminatory Comments Bear Insufficient Relationship to the Adverse Employment Action

Next, Nixon points to evidence that supervisors, including her own, made discriminatory comments regarding her age. *See* Nixon Dep. at 235:23–236:19; 237:11–238:10; 239:6–241:9. In particular, Nixon testified that the individual who served as her supervisor in months leading up to her termination harassed her; called her a dinosaur; asked her why she did not retire or leave; and told her that she was not wanted, did not understand technology, and would "never get it." *Id.* at 171:11–24, 235:23–236:12; 175:2–20. She also testified that other supervisors called older employees dinosaurs and told older employees that they "should not be a part of this going forward with the changing of the company, building and restructuring" as well as that "if you can't pick this up, then you are all dinosaurs." *Id.* at 235:23–236:19; 237:11–23; 239:7–11; 240:6–241:9. Nixon could not recall the precise dates or circumstances of these comments, although her deposition testimony suggests that most dated to the summer or fall preceding her termination. *See id.* at 40:14–17; 239:12–240:5; 175:13–25.

The Second Circuit has explained that remarks suggesting age-based animus may support an inference of discrimination at the prima facie stage depending upon the context in which they are uttered: "the more remote and oblique the remarks are in relation to the employer's adverse

action, the less they prove that the action was motivated by discrimination." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). For example, as this Court has previously remarked, "statements of a few individuals—none of them decision-makers, none involved in [the plaintiff's] discrimination, and some of them not even identified—suggesting that [the plaintiff] consider retiring" have low probative value in evaluating a claim of discrimination. *Seivright v. Montefiore Med. Ctr., Hosp. of Albert Einstein Coll. of Med.*, No. 11-CV-8934 (AJN), 2014 WL 896744, at *10 (S.D.N.Y. Mar. 3, 2014); *see also, e.g.*, *Burke v. Evans*, 248 F. App'x 206, 208 (2d Cir. 2007) (summary order) (finding no inference of discrimination when evidence consisted only of "vague recollections of conversations with co-workers" who were not supervisors, "anecdotes based on hearsay, and other unsupported speculation").

The discriminatory comments alleged here do not advance Nixon's pretext case. Remarks by another supervisor who Nixon admits played no role in her termination could—at most—support an inference that individuals in leadership positions at the College Point call center harbored age-based animus and believed that older employees should retire. But Nixon has identified no facts suggesting a nexus between these beliefs and either her disciplinary violations or her ultimate termination. The evidence that Nixon's supervisor made such remarks is more probative of discrimination, but insufficient to create a genuine dispute of material fact as to the cause of her termination, as Nixon fails to explain how her supervisor's discriminatory motives or actions could be imputed to the makers of that decision.

Nixon might have attempted to prove a cat's paw theory of discrimination here, arguing that her biased supervisor's treatment of her was a but-for cause of her reported disciplinary and policy violations and accordingly of Defendant's ultimate termination decision. *See, e.g.*,

*Herbert v. Nat'l Amusements, Inc.*, No. 3:08-CV-1945 (VLB), 2012 WL 201758, at *2–3 (D. Conn. Jan. 23, 2012); *cf. Velazco v. Columbus Citizens Found.*, 594 F. App'x 27, 27 (2d Cir. 2015) (summary order) (assuming without deciding that the cat's paw theory of liability applies to ADEA claims). But even assuming that Nixon's supervisor's bias was the but-for cause of her initial disciplinary reports—and perhaps even Defendant's determination that her explanations for her mistaken logins were not credible—the undisputed evidence makes clear that under Defendant's progressive discipline policy those violations permitted decision-makers reviewing her file to terminate her for their own unbiased reasons. *See Herbert*, 2012 WL 201758, at *2 (noting that evidence that employer the employee for reasons that were "sufficient in themselves to justify termination" precludes a showing that age was a but-for cause of termination) (quoting *Simmons v. Sykes Enterprises Inc.*, 647 F.3d 943, 950 (10th Cir. 2011)). Plaintiff has identified no facts from which the jury could find that her supervisor's bias was the but-for cause of the *termination* decision, even if one accepts the tenuous, but available, inference that it played a role in generating her initial disciplinary reports.

And apart from the conjecture that the individuals involved in her termination tolerated discriminatory queue-routing—a theory that no reasonable jury could adopt on this record, and which, even if believed, has limited probative value as to Plaintiff's termination on other grounds—Plaintiff identifies no facts at all from which a jury could infer that such individuals harbored age-based animus, let alone that they would not have terminated her but for her age.

Accordingly, the discriminatory remarks Plaintiff claims were uttered are too remote and oblique from her ultimate termination for a reasonable jury to conclude that her employer's legitimate nondiscriminatory justifications for her termination were pretextual.

### c. Plaintiff Identifies Insufficient Material Facts to Support Her Discriminatory Queue-Routing Theory

Nixon's final argument in favor of pretext is that Defendant created a discriminatory performance evaluation scheme by which Defendant assigned older Inbound Sales Representatives to the customer service queue, depressing their performance on TWC's evaluation metrics relative to younger representatives who remained assigned to the sales queue. Nixon argues that this theory, together with the evidence that individual supervisors harbored age-based animus, is sufficient for a jury to conclude that her workplace was permeated with ageism—and to conclude on this basis that Nixon's age was a but-for cause of its decision to terminate her. It is not.

Nixon identifies several pieces of admissible evidence to support her theory. First, Smith testified in her deposition that a call center employee responsible for monitoring phone queues engaged in a practice of assigning Inbound Sales Representatives to the service queue in order to reduce wait times in the queue. Smith Dep. at 39:9–43:14. Smith testified that she personally witnessed these queue reassignments. *Id.* at 45:20–46:4. Smith further stated in her declaration testimony that she had personally assigned representatives to queues when she was a supervisor. Smith Decl. ¶¶ 14–16. Second, Smith testified that "all of our supervisors would tell us" that long-term older representatives would get more service calls. Smith Dep. at 140:18–141:25. She further testified that these supervisors informed her that a different TWC facility was now performing the queue-routing function. *Id.* at 139:10–25. Third, both Plaintiffs testified that while they were only receiving service calls, they could hear younger Inbound Sales Representatives around them who were only receiving sales calls. Nixon Dep. at 279:17–287:14; Smith Dep. at 140:2–23. Both Plaintiffs testified that they could identify their younger

colleagues' calls as sales based on the different script used for such calls.  Nixon Dep. at 280:7–282:19; Smith Dep. at 140:5–17.

Throughout its briefing, Defendant argues that this evidence is insufficient to raise a genuine dispute of material fact as to the existence of discriminatory queue-routing.  Its primary arguments are that (a) several statements are inadmissible hearsay; (b) Plaintiffs offer no evidence contradicting Defendant's corporate representatives' declaration testimony that queue routing was technologically impossible during the relevant period; and (c) Plaintiffs' testimony undermines their contention that the purported queue-routing was in fact discriminatory.  The Court concludes that there is no genuine dispute of material fact regarding this theory for a simpler reason: Nixon has failed to set forth specific facts showing that the theory is more than "mere speculation or conjecture."  *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

As an initial matter, Defendant is incorrect that Plaintiffs' evidence must be excluded as impermissible hearsay.  Plaintiff Nixon's deposition testimony regarding her coworkers' statements is not offered for the truth of the matters asserted in those statements—what products TWC offered or how the representatives could facilitate a sale thereof.  Instead, the testimony is offered for the subject matter at issue in those statements: sales rather than service.  Furthermore, Defendant's contention that Plaintiff Smith's testimony regarding supervisor comments constitutes inadmissible hearsay fails to explain why that testimony would not be admissible under Rule 801(d)(2)(D) as statements by Defendant's agents or servants concerning a matter within the scope of their employment and made during the existence of the relationship.  The party admission exclusion does not require that the declarant be the final decision-maker on a matter; the declarant "need only be an advisor or other significant participant in the decision-making process that is the subject matter of the statement."  *United States v. Rioux*, 97 F.3d 648,

661 (2d Cir. 1996). Although it is not clear whether the operation of the queue-routing function was within the decision-making authority of Plaintiffs' direct supervisors—particularly after that function was purportedly transferred to a different site—the Court declines to exclude it as hearsay at this stage, particularly when Defendant's assertion that the claim constitutes hearsay, offered only in its reply submissions, is accompanied by no argument why Smith's testimony does not fall within this well-recognized nonhearsay category.

As to the second argument, whether queue routing was technologically possible remains a disputed material fact. Defendant focuses primarily on the undisputed—but irrelevant—point that *calls* could not be routed to individual representatives. This, however, is not Plaintiffs' theory; their theory concerns routing of queues. For this reason, Smith's assent in her deposition that she received service calls due to customer selection rather than company direction, Smith Dep. at 48:7–49:2; 52:17–54:23; 56:3–16, does not, in context, contradict her point elsewhere that the company could reassign representatives to different queues.

Even properly conceived as a *queue*-routing theory, however, Plaintiffs' evidence fails to create a genuine issue of material fact. Plaintiffs' admissible circumstantial evidence is sufficient for the jury to conclude that queue routing was once technologically possible; that supervisors assented to the existence of this practice and to its transfer to another unit; and that Plaintiffs continued to receive significantly more service calls than their younger counterparts. But even if the jury credited all of this evidence and drew all inferences in Plaintiffs' favor, Plaintiffs have not identified any factual basis on which the jury could base a conclusion that the queue-routing practice, once transferred out of their call center, could or did target older representatives—or that Plaintiffs' disproportionate service calls were the result of targeting rather than bad luck. In order to believe this theory, the jury would have to assume that the

individuals responsible for queue-routing at TWC's headquarters in North Carolina knew the ages and work schedules of the College Point call center's employees and shared the age-based animus of the College Point supervisors, as well as that the College Point supervisors would have some basis for knowing both of these facts to be true when they informed the Plaintiffs, in vague terms, that older employees took more service calls. Plaintiffs have identified no factual basis on which the jury could premise these assumptions. In fact the record contradicts them by indicating that another older Representative regularly received sales calls. Smith Dep. at 143:2–14; 153:6–15. The jury would therefore have to make the further assumption that the purported remote queue-routing practice targeted only some older employees—but nonetheless did so based on their age. But the availability of these tenuous conjectures is insufficient to carry Plaintiffs' burden: a summary judgment motion "will not be defeated merely . . . on the basis of conjecture or surmise." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

Accordingly, the record is insufficient to create a genuine issue of material fact with respect to whether Defendant routed the less lucrative service queue to older representatives out of a remote location as part of an effort to downgrade older representatives' performance metrics and push them out of their positions. Considering "the record as a whole, just as a jury would," *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir.2001) (superseded in part on other grounds), does not disturb this conclusion. No rational jury could conclude that the discriminatory comments of supervisors at the College Point call center and the mere speculative possibility of discriminatory queue-routing at a separate facility are together sufficient to indicate that Defendant's explanation that Plaintiff was terminated based on undisputed policy violations is pretext for consideration of age without which Plaintiff would not have been terminated.

Accordingly, the Court finds that summary judgment for Defendant on Nixon's ADEA termination claim is warranted.

## VI. Supplemental Jurisdiction over the Remaining Local Law Claim

The Supreme Court has commented that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

The Court finds no reason to deviate from this normal practice here. Because "the Court has not yet invested resources necessary to resolve [these] claims," and because "[t]he extensive discovery already taken is likely sufficient to enable [these] claims to be evaluated in state court without any additional discovery," *see Vuona v. Merrill Lynch & Co., Inc.*, 919 F. Supp. 2d 359, 394 (S.D.N.Y. 2013), the Court declines to exercise supplemental jurisdiction over Plaintiffs' NYCHRL claims and thus dismisses the claims without prejudice.

## VII. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment as to Plaintiff Nixon's federal age discrimination claims is GRANTED. The Court DECLINES to exercise supplemental jurisdiction over the remaining NYCHRL claims, including all claims brought by Plaintiff Smith, and dismisses such claims without prejudice. Accordingly, the Clerk of Court is respectfully directed to enter judgment and close the case.

This resolves Dkt. Nos. 61, 67, and 77.

SO ORDERED.

Dated: March 29, 2019
New York, New York

ALISON J. NATHAN
United States District Judge